UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

MARIO TETA and RONALD MACHADO :
:
    Plaintiffs                            CASE NO: 3:02-CV-02183-JCH
:
Vs.                                             :
:
LI QUIN FU, SHANGHAI MATSUOKA
COMPANY, LTD., LONG YI WANG,
AMANDA Z. MAW, JERRY WANG,
VICKI ZHANG and MATSUOKA
AMERICA LIMITED
:
:
    Defendants                        OCTOBER 19, 2006

## AFFIDAVIT OF DEBT

1. My name is Mario Teta, and I am a plaintiff in the above captioned matter.

2. Ronald Machado is my business partner, Ronald Machado and we conduct business as general partners.

3. At a meeting the individual defendants informed us that they were working directly for defendants Shanghai Matsuoka Co. Ltd and Matsuoka America Ltd. proposed that the plaintiffs investigate opportunities to purchase printing operations in exchange for a fee of six to fifteen (6 to 15%) percent of the purchase varying on the size of the deal.

4. At said meeting plaintiff Teta discussed and disclosed to the defendants who were present his existing and ongoing business relationship and knowledge with the printing operation of Sir Speedy.

5. The defendants were unfamiliar with Sir Speedy.

6. On, or about, July 2001, the plaintiffs and defendants Shanghai Matsuoka Co. Ltd entered into an agreement (hereinafter the "Agreement") whereby the plaintiffs would investigate printing operations in America in exchange for a fee of six to fifteen (6-15%) percent of the total purchase price.

7. At that meeting the plaintiffs and defendants also requested that the plaintiffs in return for commission procure a source for the defendants to purchase Old Corrugated Cardboard paper #11 ("OCC #11") and establish accounts for said purchase. The plaintiffs would be compensated at a rate of $.50 to $1.00 per ton on a continuous ongoing basis as purchases of OCC #11 were made by the defendants.

8. Defendant Long Yi and defendant Maw stated and represented to the plaintiffs that $3,000,000.00 (Three Million Dollars) were on reserve allocated to purchase OCC #11 and per information and belief were purchased.

9. Defendants Long Yi and Maw represented that tens of thousands of OCC #11 tonnage would be purchased.

10. The plaintiffs pursuant to the terms of the Agreement, perform their obligations and investigated and provided the defendants with information regarding several printing operations that were for sale in the United States.

11. The plaintiffs in accordance with the terms of the Agreement exercise, exploit, and utilize their existing relationship with the largest privately owned printing operating in the United States, said printing operation commonly known as Sir Speedy.

12. Plaintiff Teta took said defendants to a Sir Speedy, Waterbury, Connecticut location. The defendants, specifically defendant Fu, expressed significant approval and excitement over the general Sir Speedy operation, its state of the art technology and use of high technology equipment in the operation and procedural operations

13. Following the view of the Sir Speedy operation, defendant Maw stated to plaintiff Teta that defendant Fu was interested in purchasing some twenty (20) or more Sir Speedy locations.

14. The plaintiffs also provided the defendants with information on Recycle America, a division of Waste Management Inc., which was known to the plaintiffs to be one of the largest recycling companies in North America.

15. On, or about, the third week in August, 2001, defendant Long Yi expressed his complete satisfaction with the business of Recycle America as a source for purchasing OCC #11 after visiting Waste Management in Kensington, Connecticut, with plaintiffs for defendant Matsuoka America.

16. On, or about May 15, 2002, to the shock and surprise of the plaintiffs, defendant Maw informed the plaintiffs that defendant Shanghi had purchased the franchise rights from Sir Speedy for all of China and Hong Kong.

17. On information and belief, defendant Shanghi secured the master franchise agreement with Sir Speedy for exclusive rights to China to open some two

hundred (200) centers throughout China by the year 2007, a transaction worth many millions of millions of dollars.

18. On, or about, May 15, 2002, defendant Maw stated to plaintiff Teta that defendant Zhang had instructed her not to use the plaintiffs but go directly to the California headquarters of Sir Speedy and proceed with defendant Fu's interest in Sir Speedy. Pursuant to the terms of the Agreement the plaintiffs were to handle or assist in any can all proposals with Sir Speedy or any business entity where contact with said business and the defendants was initiated or brought about by efforts of the plaintiffs.

19. Defendant Maw expressly stated to the plaintiffs that she received a telephone call from Mr. Randy Long of Sir Speedy to thank her for the proposal from Matsuoka America Limited.

20. On, or about June 7, 2002, the plaintiffs spoke with defendant Lons Yi regarding the Agreement and their entitlement to compensation. Defendant Long Yi expressly stated that the plaintiffs were in fact entitled, under the Agreement, to compensation for bringing Sir Speedy and the defendants together, but that it was defendant Fu who was responsible for payment to the plaintiffs and not him.

21. On, or about June 10, 2002, the plaintiffs met with defendant Long Yi and defendant Maw in New York City at which time defendants Long Yi and Maw again agreed and admitted that the plaintiffs were entitled to their fee for the work they performed pursuant to the Agreement.

22. In 2001, my partner and I entered into an agreement with Matsuoka American Limited and related entities, whereby we were, promised a six to fifteen (15%) percent commission if the Defendant purchased an interest, or a license from Sir Speedy Corporation to operate them in mainland China.

23. We introduced the Defendants to Sir Speedy and Sir Speedy entered into a license transaction whereby $1,000,000.00 was paid for the License and continuing revenues of $120,000.00 per month in royalties are being paid from just one store.

24. We were entitled to fifteen (15%) percent of the purchase price. Revenues for the first stores in China were $250,000.00 per year. Over the past few years, that would mean 15% of $1,000,000.00 or $150,000.

25. In addition, we, pursuant to our agreement with the Defendants, arranged for the purchase of at least $3,000,000.00 of corrugated paper for which we would be entitled to, in 2001, a six to fifteen (6-15%) percent of total revenues commission, or $450,000.00.

26. Our agreement was that we would be entitled to commissions on the sale of any stores or rights to stores of the Defendants. Based upon the testimony of Sir Speedy and upon the Defendant's own website that transaction consists of

200 stores and a gross value of $ 51,350,000.00. Assuming just a 10% commission, the commission totals $5,135,000.00.

27. Our total damages are as follows:

    a. Sir Speedy, license, $1,000,000.00 @ 10%   $100,000.00
    b. Sir Speedy, 200 new stores, $51,350.00 @ 10%   $5,135,000.00
    c. Corrugated paper, year 1, $3,000,000.00 @ 10%

    $300,000.00

Total Damages    $5,535,000.00

_Mario Teta_ (signature)
Mario Teta

Sworn and subscribed this 19th day of October, 2006

_(signature)_
Notary Public